# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CHARLES FISH,**

**Plaintiff,**

**-vs-**                                             **Case No.  6:04-cv-1716-Orl-22JGG**

**UNUM LIFE INSURANCE COMPANY OF AMERICA,**

**Defendant.**

_____

# O R D E R

## I.  INTRODUCTION

Charles Fish sues Unum Life Insurance Company of America pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking to recover benefit payments under an employer-provided group long-term disability policy.  Both sides have moved for summary judgment.  After carefully considering the parties' submissions, the Court determines that Unum is entitled to judgment as a matter of law on Fish's claims.

## II.  BACKGROUND FACTS

Fish is the owner, or "unit operator," of a Chick-fil-A franchise in Orlando, Florida.  On April 1, 2000, Fish sustained an on-the-job injury when the spring-loaded rear hatch of a delivery truck struck the back of his head.  The impact herniated a disc in Fish's neck.  Following the injury, Fish received conservative treatment from two orthopaedists.  During the first few weeks after the accident, Fish took several days off from work.  The remainder of the time during the first few weeks, Fish was

partially unable to work.  In the ensuing months, he was able to continue working, although he maintains his ability to perform his job duties was limited.

Treatment records of Fish's orthopaedists reflect that Fish was seen after the accident by Dr. Marc Gerber.  Office notes in the claims file reflect a visit on May 1, 2000.  UACL00144-45.[1]  At that time, Fish was experiencing "neck pain and right upper extremity symptoms."  UACL 00145.  Dr. Gerber conducted an electrodiagnostic study of Fish's right upper extremity.  UACL00144-45.  Dr. Gerber prescribed physical therapy and a resting hand splint.  UACL00145.[2]  Dr. Gerber added that Fish might be a candidate for a cervical epidural block should his symptoms not resolve through less invasive measures.  *Id*.  Regarding "WORK STATUS," Dr. Gerber stated: "Continue the same restrictions."  *Id*.  Unfortunately, because there are no medical records in the claims file describing the initially-imposed restrictions, it cannot be ascertained with absolute certainty what the prior work restrictions were.

Fish saw Dr. Gerber again on May 23, 2000.  UACL 00147-146.  At that visit, Fish reported continuing numbness, tingling and discomfort in his right hand, as well as continuing neck pain.  UACL 00147.  Dr. Gerber decided to give Fish a corticosteroid injection into the wrist.  *Id*.  Dr. Gerber stated:

> The disc protrusion in the cervical spine was not large enough to be causing nerve root compression or spinal cord compression.  This may still be contributing to some neck discomfort, although I feel a lot of his symptoms are due to an inflammatory process in the

---

[1]There are no office notes in the claims file for prior visits.

[2]The hand splint was later disapproved, presumably by Fish's health insurer.  UACL 00147. It is unclear whether Fish ever obtained this device.

> wrist.   The injection will help in determining the site of pathology which may be giving him these symptoms.  If the injection does not help, I will consider a cervical epidural block as the last intervention before getting a second opinion from Dr. Broom.

*Id.* Dr. Gerber also noted that he was suspending physical therapy, as Fish "did not feel significant change in his symptoms."  *Id.*  Regarding work status, Dr. Gerber stated: "Continue light duty restrictions.  No lifting or bending over 10 pounds until recheck."  UACL 00146.

Fish's next visit was on June 5, 2000.  UACL 00148-49.  Fish's wrist problems had improved; however, Fish continued to experience neck pain.  UACL 00148.  Dr. Gerber noted: "He still has some stiffness in the cervical area with mild limitations in range of motion.  This may still be coming from the disc protrusion at C5/6."  *Id.*  Dr. Gerber recommended that Fish obtain the hand splint and try it for a few weeks before proceeding with further treatment. *Id.*  Dr. Gerber also recommended another course of physical therapy.  *Id.* Dr. Gerber stated that if these measures were not helpful, the next treatment option would be a cervical epidural block.  *Id.*  Concerning work restrictions, Dr. Gerber stated: "The patient will continue with the same previous restrictions.  He is working.  He is not doing any heavy lifting or bending."  UACL 00149.

When Dr. Gerber next saw Fish on June 26, 2000, Fish was still reporting "neck pain and right arm pain."  UACL 00150.  "Due to the continued right sided symptoms, and the disc protrusions seen on the MRI," Dr. Gerber decided to refer Fish to Dr. Michael Broom for a second opinion.  *Id.*[3]  Dr. Gerber indicated that he had recommended an "epidural steroid injection . . . under fluoroscopy."  *Id.*

------

[3]From their letterhead, it appears Dr. Gerber and Dr. Broom practiced together.

However, he stated before doing this, Fish would be getting the second opinion from Dr. Broom "to see if he has any other suggestions or ideas." *Id.* Dr. Gerber also noted: "I am not sure [Fish] would be a surgical candidate," but indicated that he would await Dr. Broom's opinions concerning further treatment. *Id.* Dr. Gerber closed his notes by stating: "Continue commonsense restrictions. Patient has been working full-time with the recommendations of avoiding any heavy lifting or bending which he feels would aggravate his symptoms." UACL 00151.

On July 12, 2000, Fish was seen by someone on Dr. Broom's behalf, but apparently not by Dr. Broom himself.[4] UACL00153. The office notes for the July 12th visit reflect that Fish reported continued neck and right arm pain. *Id.* Regarding this, the office notes state: "Overall, neck pain is reduced as compared to the time of the injury. Right upper extremity symptoms have worsened and bother him towards the end of the day and with various activities." *Id.* Concerning Fish's cervical disc protrusion, the writer stated: "I would agree that he is a candidate for cervical, epidural steroid injection. The relative acuity of his injury would argue against surgical intervention at this time. He may benefit from cervical traction as well and this was written for today." *Id.* The author also stated that an epidural injection had been arranged through Dr. Gerber. *Id.* A subsequent report reflects that the epidural steroid injection was performed eight days later, on July 20, 2000. UACL00154.

Fish returned to Dr. Gerber on August 2, 2000. UACL00155-56. Fish reported only a few days improvement as a result of the epidural injection, and continued to complain of neck pain and discomfort. UACL00155. Noting that Fish had not actually been seen by Dr. Broom during the July

---

[4]The office notes indicated that Fish was seen by "MB/CW." UACL00153. Presumably, "MB" refers to Dr. Michael Broom. Undoubtedly, "CW" is a reference to someone else. But that other person's identity cannot be gleaned from the medical records. During a later visit with Dr. Gerber, Fish reported that he "only saw Dr. Broom's fellow." UACL 00155.

12th consult, Dr. Gerber stated that he would have Fish see Dr. Broom for "a further surgical consultation and a second opinion." UACL00156. Dr. Gerber observed that a second epidural might be helpful, but suggested that he was approaching the point at which further treatment might be "palliative." UACL00155. Dr. Gerber did state he was going to try Fish on Neurontin for pain-relief, and, if that did not prove helpful, Fish might try an anti-depressant. UACL00156. Regarding work restrictions, Dr. Gerber stated: "Continue commonsense restrictions. Patient is going to try to work, although there are times when he has a lot of discomfort and work is difficult." *Id.*

On August 16, 2000, Fish was seen by Dr. Broom. UACL00157. Fish continued to report pain in his neck, right shoulder and upper arm, and occasional "tingling extending to the index finger and thumb." *Id.* Dr. Broom noted: "I have reviewed his MRI again, and although there is central and right sided protrusion at the C5-6[,] I am not impressed with any significant neurocompressive pathology." *Id.* Dr. Broom suggested a TENS unit and that Fish consider a second epidural steroid injection. *Id.* Dr. Broom added: "If symptoms persist, a cervical myelogram, post myelographic CT scan could be considered. I would be hopeful that [Fish] can improve without surgery." *Id.* On September 20, 2000, Fish received a second epidural steroid injection. *Id.*

Dr. Gerber followed up with Fish on October 18, 2000. UACL00158. Fish reported that his second epidural resulted in "about two weeks of improvement," but his symptoms began to return. *Id.* Upon examination, Fish exhibited "no acute weakness." *Id.* He did have "some pain with range of motion," but showed "no significant functional limitations in range of motion." *Id.* Dr. Gerber's impression was that Fish's symptoms were consistent with "possible C6 irritation from the C5-6 disc protrusion." *Id.* (capitalization omitted). Dr. Gerber noted that Fish was using Neurontin and, occasionally, Vicodin. *Id.* Dr. Gerber stated he would refer Fish to Dr. Broom for a cervical

myelogram.  *Id.*   Regarding Fish's work status, Dr. Gerber remarked: "Continue same recommendations as previously.  Patient says he is working on a part-time basis."  *Id.*

The cervical myelogram was performed on November 6, 2000.  UACL00159.  Upon reviewing the study, Dr. Broom noted: "There does appear to be a disc protrusion, eccentric to the right at C5-6.  Clinically, his radicular symptoms into the right upper extremity are consistent with this."  *Id.*

On November 17, 2000, Fish visited Dr. Broom to discuss the results of his myelogram.  UACL00160.  Fish continued to report "neck and radiating right arm symptoms with numbness and tingling extending occasionally to the right thumb and index finger."  *Id.*  Dr. Broom explained the myelogram results, and advised Fish "that if neck and arm symptoms were severe enough, [Dr. Broom] would offer [Fish] anterior cervical discectomy and fusion."  *Id.*  Dr. Broom explained the risks of that procedure, whereupon Fish indicated he would like to proceed with it.  *Id.*

On December 5, 2000, Fish underwent the discectomy and fusion surgery.  UACL00162-161.  According to Dr. Broom, Fish "tolerated the procedure well."  UACL00161.

On December 22, 2000, Fish was seen by Dr. Broom.  UACL00163.  During that visit, Fish reported that his arm symptoms had resolved and he no longer had numbness in his arms.  *Id.*  Dr. Broom noted that Fish "has been doing very well since discharge."  *Id.*  Dr. Broom also stated that he "encouraged [Fish] to try and increase walking."  *Id.*  Concerning Fish's work status, Dr. Broom stated: "I will allow him out of work, but I would anticipate allowing him back to work with limitations on the next exam."  *Id.*

Fish next saw Dr. Broom on January 12, 2001.  UACL00164.  At that time, Fish reported that he was "doing well with regard to his neck," and that he was "having no further arm pain or numbness."  *Id.*  However, Fish did state that his wrist occasionally shook during "excessive

activities," and his "major complaint" was "pain in the low back without radiation into the leg," which had "been bothering him since the injury." *Id.* Dr. Broom provided Fish "with instructions and routines of back exercises," and noted that he would see Fish again in four weeks. *Id.* Regarding work restrictions, Dr. Broom stated: "**He can return to work, avoiding excessive overhead work, frequent bending, twisting, climbing and lifting over 10 lbs.**" *Id.* (emphasis in original).

Fish saw "MB/MCR" on February 9, 2001. UACL00165. Fish reported that he was doing well with respect to neck and right arm pain, although he still experienced "shakiness in the wrist with repetitive activities." *Id.* Fish indicated he wished to resume physical therapy to address some "aches and pains in the back, which does respond to stretching." *Id.* Among other things, the examiner noted: "His neck range of motion is good. He has 5/5 strength in all major muscle groups and both upper extremities. He ambulates well. Straight leg raise is negative. Range of motion of his trunk is unchanged." *Id.* The treatment provider outlined the following plan: "I will initiate a physical therapy program for stretching, strengthening and trunk stabilization 2 to 3 times a week for the next 4 weeks. I will hold off on any therapy for the neck at this time. Follow up will be in 5 weeks." *Id.* Regarding work status, the writer stated: "He will continue working with his current restrictions including the avoidance of excessive overhead work; frequent bending, twisting, and climbing, and lifting over 10 pounds." *Id.*

Fish's next office visit was on March 16, 2001. UACL00166. Fish reported that his therapy was going well and that his low back symptoms had "improved significantly." *Id.* Upon examining Fish, the medical provider ("MB/MR") reported his cervical spine exhibited excellent range of motion. *Id.* Fish did present with "some weakness with the wrist extension with repetitive testing." *Id.* The author observed: "As the patient is doing well and was able to golf yesterday, I would place

him at MMI at this point.  He is to continue with his home exercise program.  He will follow up as needed." *Id.*

On April 2, 2001, a year and a day after the accident, Dr. Broom sent a letter to an attorney (presumably Fish's counsel).  UACL00026.  Therein, Dr. Broom stated Fish had "done well" following his surgery.  *Id.*  Dr. Broom also opined that Fish had sustained "an 8% whole person impairment" rating.  *Id.*  He further stated:  "Mr. Fish may occasionally require over the counter medications to control his discomforts.  I have also recommended a home exercise program.  Otherwise, I would not anticipate ongoing medical needs." *Id.*  Dr. Broom added: "I have not restricted his activities, but I do not think he should be expected to perform strenuous heavy lifting." *Id.*

Fish did not visit his orthopaedists again until October 15, 2001.  UACL00167.  During that visit, Fish stated "he was doing very well with no residual neck or arm pain." *Id.*  However, he also related that he sustained a new injury at work when some boxes fell on his head; this resulted in a concussion.  *Id.*  This was causing Fish headaches from the base of his neck up to his head.  *Id.*  Dr. Broom noted:  "There is a local area of tenderness in the region of the C7 spinous process.  Otherwise, [Fish] has good range of motion.  I did not detect motor or sensory deficits in the upper extremities." *Id.*  Dr. Broom injected "DEPO MEDROL and XYLOCAINE into the area of maximal tenderness in the cervical region." *Id.*  He also suggested several weeks of physical therapy "to re-acquaint [Fish] with a neck exercise routine and modality treatments." *Id.*  Dr. Broom added: "He can continue working without restrictions.  If he is unimproved, he can call." *Id.*

Fish saw "MB/RR" approximately five months later, on March 19, 2002.[5] UACL00168. The office notes for that visit state: "The patient continues to do well with minimal problems. He still has some residual pain and shakiness in his right wrist, but is improved with the physical therapy and home exercise program." *Id.* The notes also state: "[Fish] can continue his activities as tolerated. We will allow him to continue working without limitations. We will follow him back as needed." *Id.* This is the last record of orthopaedic treatment which appears in the claims file.

On July 31, 2002, Dr. Broom completed an Attending Physician's Statement ("APS") on a Unum form. UACL00002. This document was submitted to Unum in early August 2002; however, it was not accompanied by a claim form. Accordingly, the claim was closed as "incomplete" on September 6, 2002. UACL00009.

In the section of the APS entitled "RESTRICTIONS (What the patient should not do)," Dr. Broom stated: "RTW [without] limitation: only common sense precautions 10/15/01." UACL00002. In the section entitled "LIMITATIONS (What the patient cannot do)," Dr. Broom stated: "None." *Id.* He listed Fish's prognosis as "Good," and reported that Fish had achieved maximum medical improvement. *Id.* Dr. Broom also indicated that he had last seen Fish on March 19, 2003, at which time Fish was experiencing "[s]ubjective symptoms" of "minimal discomforts occas [right] wrist sx." *Id.* Dr. Broom also reported the following "[o]bjective findings": "3/19/02 mild lucency otherwise appears solid." *Id.*

---

[5]A note on one of Fish's medical records indicates Fish did not keep an appointment on February 28, 2002. UACL00167.

Fish submitted a claim form to Unum on October 7, 2002.[6]  UACL00047.  Therein, he provided the following job description:

> Duties include all aspects of owning and operating a quick-service restaurant - hiring, scheduling & training employees, ordering food and paper products, preparation and quality control of menu items, inventory management, marketing, public relations, customer service, payroll, managing accounts receivable and accounts payable, bookkeeping, etc.

UACL00038.  He allocated 80% of his job duties to "Operations," 10% to "Marketing," and 10% to "Human Resources."  UACL00037.  He indicated he was currently working full time, and that he worked "40+" hours weekly.  UACL00039.

Fish also submitted a document entitled "DISABILITY SUMMARY."  UACL00043.[7] Therein, Fish stated:

> I suffered a neck injury on 04-01-00.  I had surgery on 12-05-00 and was thus totally disabled from work from 12-05-00 through 2-12-01. Subsequent to this period of total disability, my ability to work has continued to be limited by the permanent partial disability resulting from my injuries.  I cannot otherwise specify the extent of my disability since 02-12-01.

> Regarding disability before the surgery, I know my injuries rendered me totally unable to work on several days during the first few weeks after 04-01-00.  On the other days during the first few weeks after 04-01-00, my injuries rendered me partially unable to work.

> The remaining time between the day I was injured and the surgery on 12-05-00, my ability to do my work was limited by my injuries. However, I cannot otherwise define the extent of my disability during

---

[6]Unum processed Fish's claim despite its arguable untimeliness.

[7]It appears Fish also submitted the April 2, 2001 letter from Dr. Broom to the attorney, UACL00045, a list of Fish's medical treatment providers, UACL00046, and a document reflecting Fish's monthly income, UACL00041.

-10-

> this period, except to point out that my medical records would show
> the dates and times I missed work getting medical care.

UACL00043.

In a telephone interview conducted on November 4, 2002, Fish reported to Unum that his "main restriction" was "tiring," and that he also could not "lift heavy objects." UACL00052. He indicated that he was not currently taking any medications, "other than an occasional Tylenol 'if the weather changes.'" *Id.* Fish also indicated he "can do most activities, but cannot lift." *Id.*

During the interview, Fish provided the following duties and requirements of his occupation:

> Does all the hiring, bill paying, all accounting, all store operations
> including cashier/cook, etc[.], watch over the unit. He said that he is
> no longer able to check out the trucks anymore and he has deligated
> [sic] this to another employee. I asked what exactly was involved in
> checking out the trucks. He said this involved unloading the items.

UACL00051. He stated that he was currently working 40 hours per week, but that he had worked 45-50 hours weekly prior to the onset of his disability. *Id.* He contended that he was "[u]nable to work as many hours due to tiring," and that he was "unable to lift heavy items." *Id.* He estimated his income had diminished by approximately 40% since his disability. *Id.* He stated that his salary had not been cut, but that he was paid based on profits and sales. *Id.* He reported that it had been necessary for him to "hire a couple of additional person[n]el to make up for what he couldn't do." *Id.* Subsequently, at Unum's request, Fish furnished the company with profit and loss statements for his business, income tax returns, and records evidencing workers compensation benefits he received as a result of his on-the-job injury. UACL00062-00143. Unum also obtained records concerning Fish's medical treatment. UACL00144-00168.

On December 18, 2002, Unum undertook an analysis of Fish's pre- and post-disability monthly earnings to determine whether Fish met the income loss threshold in his disability plan. UACL00180-172.  A company CPA reviewed the calculations and concluded that Fish "did not suffer a loss of at least 20% for 180 consecutive days."  UACL00179.

On December 19, 2002, Unum conducted an occupational analysis regarding Fish's work functions.  UACL00185-181.  The senior vocational rehabilitation consultant who performed the analysis utilized the short job description provided by Fish and concluded that his essential duties were generally consistent with those of Fast Food Services Manager as described in the U.S. Department of Labor's Dictionary of Occupational Titles.  UACL000185.  The consultant classified Fish's position at the "light exertional demand level."  *Id.*  Included in the consultant's report was the following definition of "light":

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects.  Even though the weight lifted may be only a negligible amount, a job should be treated as Light Work:
>
>> 1) When it requires walking or standing to a significant degree;
>> 2) When it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or
>> 3) When the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

UACL00184.

In January 2003, Unum's in-house medical personnel performed a clinical review of Fish's treatment records.  UACL00192-186.  Specifically, the consultants were asked whether the restrictions and limitations of no strenuous heavy lifting imposed by Fish's physicians were

-12-

objectively supported. UACL00192. On January 21, 2003, neurologist Dr. Charles Sternbergh

(Unum's associate medical director) concluded: "The R&Ls of no heavy strenuous lifting are

supported by the medical record. Usual weight restrictions would be 35 to 50 pounds. Additional

R&Ls of no prolonged cervical extension would also be appropriate." UACL00189.

On January 27, 2003, Unum wrote Fish a letter denying his claim. UACL00201-198. The

letter stated, in pertinent part:

> According to the policy under which you are covered:
>
> > "You are disabled when UNUM determines that:
> >
> > - you are limited from performing the material and
> > substantial duties of your regular occupation due to
> > your sickness or injury; and
> > - you have a 20% or more loss in your indexed monthly
> > earnings due to the same sickness or injury."
>
> A vocational consultant reviewed the duties of your occupation as
> "Unit Operator" for Chick-Fil-A. The physical requirements of this
> position would be classified at the "light" exertional demand level.
> The lifting requirements at the Light level are defined as exerting 20
> pounds of force occasionally, and/or 10 pounds of force frequently,
> and/or a negligible amount of force constantly to move objects.
>
> We obtained medical records from your physician, Dr. Broom, and
> your file was also forwarded to our medical department for review. In
> a letter dated April 2, 2001, Dr. Broom notes "I have not restricted his
> activities, but I do not think he should be expected to perform
> strenuous heavy lifting." Our medical department review indicates that
> the restrictions of no heavy lifting seem appropriate, and usual weight
> restrictions would be 35 to 50 pounds.
>
> In addition, your file was forwarded to our accounting department for
> review of the financial information submitted. Earnings were
> determined using the monthly "Operator Income" as listed on the
> Profit & Loss statements provided. Each month was then adjusted by
> 1/12th the difference between Year-to-[D]ate Operator Income and the
> Net Schedule C income as reported on the tax return. A spreadsheet

> is attached reflecting our calculations.[8]   Based on the reported earnings, you did not suffer a loss of at least 20% for 180 consecutive days to satisfy the Elimination Period.
>
> In conclusion, based on the information contained in your file, you do not meet the definition of disability and are not eligible for benefits under this claim.  It doesn't appear that you met the 20% loss of earnings requirement to satisfy the 180-day elimination period.  Based on our medical department review and the restrictions and limitations given by your own attending physician, you should be able to perform the material and substantial duties of your regular occupation of "Unit Operator" which is classified as a "light occupation."

UACL00201-200 (footnote added).  The letter closed by informing Fish about his appeal rights and

procedures.  UACL00200-198.

On March 31, 2003, Fish sent Unum a letter appealing his claim denial.  UACL00217 & 215.

In pertinent part, the letter states:

> This letter is to appeal the denial of claim 0099353548.  The claim was denied based on a vocational consultant's designation that a Chick-fil-A Unit Operator's physical requirements were that of a "light" exertional demand level.  The claim was also denied based upon the premise that I had not sustained a 20% loss of earnings for 180 consecutive days to satisfy the Elimination Period.  This is all incorrect.
>
> While a Unit Operator may not have to lift 35 to 50 lbs., the physical and mental requirements of the position are quite "heavy", and require the presence of the Operator in the individual's franchise to be successful.  A review of the Chick-fil-A Independent Operator's Agreement show's [sic] that on Page 30, ITEM 15 the OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE RESTAURANT [sic].  It specifically states, "Your Independent Contractor's Agreement requires you to devote your good faith personal efforts to operate your Chick-fil-A restaurant to obtain the highest sales and profits possible and to diligently develop and

---

[8]The accounting spreadsheets were not enclosed with the January 27th letter.  After Fish pointed out this error, Unum sent him the omitted documents.  UACL00203 & 212-204.

promote the reputation of your restaurants, Chick-fil-A, and Chick-fil-A's marks.  This requirement will, for all practical purposes, require you to diligently supervise your Chick-fil-A restaurant."  This can also be found on page 6, XII. STANDARDS OF SANITATION AND BUSINESS CONDUCT, #3, of the physical contract.  Running a Chick-fil-A restaurant requires the Operator to be in the unit and actively participate in the following: promoting of the business, inside and out; hiring of the staff, interaction with customers and guests, employee training, inventory control, cost control, and continuous educational improvement.  This is by no means a "light" exertional job.  The injury I sustained on April 1, 2000, knocked me out of the unit for the better part of a year plus, well past the date of my surgery on 12/5/2000, and the physician who performed the surgery granted me an 8% whole person impairment based upon AMA guidelines.  Being a successful unit operator requires you to be in the unit, something I could not do, due to the significant impact of my injury.  This impairment will limit my ability to perform my duties defined by my contractual obligations for the rest of my life.

The claim was also denied on the premise that I had not sustained a 20% loss of earnings for 180 consecutive days to satisfy the Elimination Period.  The CPA, T. Moore, who conducted the audit of my Profit & Loss statements "Adjusted by 1/12th the difference between Year-to-[D]ate Operator Income and the Net Schedule C income as reported on the tax return."  This is an inaccurate picture of my earnings.  The difference in the Schedule C and Profit & Loss Statements can be explained by Tax Law definitions of an individual's yearly income.  Income shown on my Profit & Loss Statement for December is not paid until January.  This income also shows up on the Schedule C, for the year in which it was earned.  However, because it was "earned" in December, it does not mean it was "PAID" in December.  This means that an Operator's Taxable income is reported as what is **Paid** in January through December of a Tax Year.  For Example: I made $12,148.29 in December of 1999.  I did not get paid $12,148.29 until January 2000.  This means that the $12,148.29 was not reported on year 1999 taxes.  It was, however, reported on year 2000 taxes.  This is why there is a difference in the Schedule C and Profit and Loss numbers.  THEY SHOULD NOT BE ADJUSTED.  From April 1999 to September 1999 (180 days for the prior year mirroring the injury date of 4/1/2000), I earned $71,110.24.  From April 2000 to September 2000 (180 days to satisfy the elimination period set forth by my policy), I earned $49,382.34.  This is a 30.56% loss of indexed monthly earnings as a direct result of the injury.  The

-15-

> policy says I have to "have a 20% or more loss in [my] indexed monthly earnings due to the same sickness or injury." As you can clearly see, I meet this requirement.

UACL00217 & 215 (emphasis in original).

On May 7, 2003, a "no deference physician review" of Fish's disability claim was conducted by Dr. Joseph R. Thomas, Unum's Vice President and Lead Medical Director of Orthopaedic Surgery. UACL00233-226. Dr. Thomas addressed the following issues posed by Unum's appeals specialist: (1) whether there appeared to be any missing documentation that might provide a better understanding of Fish's clinical status, (2) whether the available clinical data supported the restriction that Fish not perform heavy lifting, and (3) the continuous duration of that restriction since the date of the accident. UACL00227. In response, Dr. Thomas stated:

> No new medical information has been supplied. Claimant had an injury to the neck, was diagnosed with a cervical disc herniation, underwent surgery and made an uneventful recovery. AP surgeon released claimant to return to work without restrictions other than to lift sensibly. He would not expect him to perform heavy lifting. His job description and actual work do not appear to include heavy lifting as a significant or substantial part of the job. It is noted that claimant is expected to participate in all aspects of operation of his fast food unit, but not to perform all of the tasks.
>
> AP statement is appropriate and would allow claimant to perform his job as a fast food unit operator. No information appears to be absent from this file.

UACL00226.

On May 12, 2003, Unum sent Fish a letter upholding its initial claim denial decision. UACL00240-238. The letter again quoted the policy's definition of disability. UACL00240. It then explained Unum's rationale for denying Fish benefits:

Your file reflects that you are claiming partial disability for a back condition that began on April 1, 2000. You have requested partial disability for the period of April 1, 2000 to current with a period of Total Disability from December 5, 2000 to February 12, 2001.

During the claims evaluation process medical records were obtained from Dr. Broom. Upon receipt of the records your file was referred for review by a Neurological Surgeon.

The Neurological Surgeon's review of the records indicated that you were struck in the back of the head, neck, and upper back with a door while at work on April 1, 2000. You began to complain of right neck and arm pain. Examination at that time demonstrated weakness of the wrist extensors on the right side. You were treated conservatively with cervical epidural steroid injections on two occasions as well as various medications. A CT myelogram demonstrated a protruding disc at C5-6 on the right side. You underwent surgery in December of 2000, with an anterior cervical discectomy and interbody fusion at C5-6 being done with an allograft and an anterior plate.

Your symptoms reversed quite well and you were released to return to work by the operating surgeon on January 12, 2001 with restrictions and limitations of avoidance of extension of your neck, bending and twisting, and lifting limitation of 10 pounds.

You continued to improve and were thought to be at maximum medical improvement on March 16, 2001. Restrictions and limitations at that time were limited to no heavy lifting and "common sense."

The Neurological Surgeon's review concluded that the restrictions and limitations of no heavy strenuous lifting are supported by the medical record. Usual weight restrictions would be 35 to 50 pounds. Additional restrictions and limitations of no prolonged cervical extension would also be appropriate.

A Vocational Consultant reviewed the duties of your occupation as a Unit Operator and indicated the physical requirements for this occupations [sic] would be classified as "light" exertional demand level.

UACL00240-239. The letter then set forth the definition of "light" contained in the Dictionary of

Occupational Titles. UACL00239.

After quoting from the prior claim denial correspondence and acknowledging receipt of Fish's letter of appeal, the May 12th letter stated that Fish's file was independently reviewed by a board-certified orthopaedic surgeon during the appellate process. *Id.* Regarding that subject, the letter quoted Dr. Thomas's conclusions that Fish's "job description and actual work do not appear to include heavy lifting as a significant or substantial part of the job," and that the attending physician's statement "is appropriate and would allow claimant to perform his job as a fast food unit operator." *Id.*

Continuing, the May 12th letter stated:

> Based on our review of the entire contents of your file it does not appear that you have satisfied the definition of disability within your contract. Furthermore, there is no clinical information within your file to support a disabling impairment. At this time, we must concur with the claim findings, as rendered on January 27, 2003, and uphold the denial of your claim for Long-Term disability benefits.

UACL00238. The letter closed by informing Fish that his administrative remedies had been exhausted and "the administrative record is now closed." *Id.*

Subsequently, Fish retained counsel to pursue his disability claim. On July 25, 2003, Fish's attorney wrote Unum, essentially asking the company to allow Fish to "re-appeal" the claim denial decision. UACL00249-247. The July 25th letter also requested a number of documents regarding Fish's claim. *Id.*

Unum responded with a letter dated August 19, 2003. UACL00253. Unum enclosed a copy of Fish's claim file, a copy of his long-term disability policy,[9] a CD of Unum's claims manual, and

---

[9]The policy Unum sent Fish's counsel was a version which became effective in August 2001. *See* Doc. 26 at 2 n.2.

curriculum vitae of the in-house physicians who reviewed Fish's claim.  *Id.*  Unum stated that it was providing this information "[a]s a courtesy."  *Id.* Unum added that a copy of the summary plan description would have to be obtained from Fish's employer (presumably meaning Chick-fil-A).  *Id.* The letter then proceeded to deny Fish's counsel's request for a "re-appeal," stating:

> Please be advised that ERISA 2002 regulations provide the claimant with 180 days to submit an appeal from the date their [sic] claim was denied.  Mr. Fish['s] claim was denied January 27, 2003 and his appeal was received in our office on April 9, 2003.
>
> An appellate decision was rendered on May 12, 2003 and Mr. Fish was advised in writing of our decision.  Upon completion of this letter Mr. Fish's administrative remedies were exhausted under his plan.

*Id.*

This lawsuit ensued.

### III.  POLICY PROVISIONS[10]

As noted in Unum's claim denial letters, the disability policy at issue contains the following definition of disability:

> You are disabled when UNUM determines that:
>
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

LTD-BEN-1 (emphasis in original).

_____

[10]A copy of the policy is attached to Unum's summary judgment motion (Doc. 26) as Exhibit "A."

The policy defines "limited" as "what you cannot or are unable to do." GLOSSARY-2. "Material and substantial duties" means duties that "are normally required for the performance of your regular occupation" and "cannot be reasonably omitted or modified." *Id.* For unit operators, "monthly earnings" means "the greater of 1/12th or [sic] prior calendar year's actual earned income or current year's average monthly base, incentive and extra draw." LTD-BEN-5.[11]

The policy contains a 180-day elimination period. B@G-LTD-1; LTD-BEN-4. "Elimination period" is defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from UNUM." LTD-BEN-4. By way of explanation, the policy states: "You must be continuously disabled through your **elimination period**. UNUM will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period." *Id.* (emphasis in original).

The "Certificate Section" of the policy states: "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." CC.FP-1. The policy also states that the policy consists of "all policy provisions and any amendments and/or attachments issued;" "participants' signed applications;" and "the certificate of coverage." C.FP-1.

## IV. ERISA STANDARD OF REVIEW

---

[11]In another part of the policy, "monthly earnings" is defined as "your gross monthly income from your Employer as defined in the plan." GLOSSARY-2.

The Supreme Court has held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B)[12] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (footnote added); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) (quoting *Bruch*).  Expanding on this principle, the Court of Appeals for the Eleventh Circuit stated in *Kirwan*:

> This circuit has interpreted *Bruch* to mandate *de novo* review unless the plan *expressly* provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms. Thus, this court has applied the arbitrary and capricious standard when the plan provides that the administrator[']s "determinations shall be final and conclusive" so long as they are "reasonable determinations which are not arbitrary and capricious."  This court has also applied the arbitrary and capricious standard when the plan confers upon the administrator "full and exclusive authority to determine all questions of coverage and eligibility" and "full power to construe the provision[s]" of the plan.  On the other hand, this court has applied the *de novo* standard when the plan confers upon the administrator the authority to make initial eligibility determinations "according to the terms of the Plan."

10 F.3d at 788 (emphasis in original) (footnotes and some internal quotation marks omitted).

If the *de novo* standard applies, a district court reviewing a benefits determination "is not limited to the facts available to the Administrator at the time of the determination." *Kirwan*, 10 F.3d at 789.  On the other hand, if the arbitrary and capricious standard applies, "the administrator's fact-based determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d

---

[12]Section 1132(a)(1)(B) authorizes a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

1446, 1451 (11th Cir. 1997).  The arbitrary and capricious standard applies to the administrator's

"construction of the plan and concomitant factual findings[.]" *Id.*  However, if an administrator who

has been granted discretion under the plan has a conflict of interest, a "heightened" arbitrary and

capricious standard governs.  *Id.* at 1449.  Such a conflict of interest exists where a plan is

administered by an insurance company which pays benefits out of its own assets.  *See, e.g., Brown*

*v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1561-68 (11th Cir. 1990).  Under this

heightened arbitrary and capricious standard,

> "a wrong but apparently reasonable interpretation is arbitrary and
> capricious if it advances the conflicting interest of the fiduciary at the
> expense of the affected beneficiary or beneficiaries unless the fiduciary
> justifies the interpretation on the ground of its benefit to the class of all
> participants and beneficiaries."

*Godfrey v. BellSouth Telecomms., Inc.,* 89 F.3d 755, 758 (11th Cir. 1996) (quoting *Brown*, 898 F.2d

at 1566-67).  This principle is limited by an important precondition:  "'[t]he fiduciary's interpretation

first must be "wrong" from the perspective of a *de novo* review[.]'"  *Godfrey*, 89 F.3d at 758 (quoting

*Brown*, 898 F.2d at 1566 n.12).

"In an ERISA benefit denial case [subject to deferential review], . . . in a very real sense, the

district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but,

rather, evaluates the reasonableness of an administrative determination in light of the record compiled

before the plan fiduciary."  *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)[13] (quoted with

approval in *Curran v. Kemper Nat. Servs., Inc.*, No. 04-14097, 2005 WL 894840 *7 (11th Cir. Mar.

---

[13]Although the First Circuit did not qualify the foregoing quote, this Court interprets the
appellate court's statements as applying to those cases where a plan administrator has been granted
discretion, rather than to those subject to *de novo* review.

16, 2005) (unpublished *per curiam* opinion[14])).[15]  Accordingly, "[w]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir. 1999).

## V.  THE PARTIES' POSITIONS

Unum maintains that the disability policy contains language granting the insurer discretionary authority, with the result that Unum's benefit denial decision must be reviewed under the arbitrary and capricious standard of review.  Addressing the first step under the arbitrary and capricious standard, Unum argues that its decision was "*de novo* correct."  The insurer contends it properly determined that Fish did not satisfy the 180-day elimination period because he could perform the essential functions of his job.  Unum also maintains it correctly calculated Fish's monthly income and properly determined that Fish did not experience a qualifying loss of at least 20% of his pre-disability income.  According to Unum, the same result occurs even when Fish's own income figures are utilized.  Unum further maintains that if the Court determines Unum's decision was wrong under the *de novo* standard, the decision was nevertheless reasonable.  Finally, Unum asserts that no conflict of interest analysis is necessary, even though it pays claims out of its own funds, because its decision was correct and reasonably supported.  However, if the conflict of interest issue must be reached, the

---

[14]In accordance with 11th Cir. R. 36-2 and I.O.P. 6, this Court considers *Curran* merely persuasive authority, rather than binding precedent.

[15]This Court recognizes that even under abuse of discretion review, there may be some instances when it is appropriate to consider evidence beyond the administrative record (e.g., evidence relevant to a plan administrator's conflict of interest).

insurer contends that "any self-interest that Unum may arguably have for denying a particular claim is substantially outweighed by its obligation to faithfully interpret the plan and pay benefits only to those who come within the plan's definitions."  Doc. 26 at 19.

In response, Fish argues that *de novo* review applies, rather than the arbitrary and capricious standard, because Unum was never actually delegated discretionary authority under the plan at issue. Fish then argues that Unum's decision to deny Fish benefits was wrong.  Fish maintains that Unum never examined the true bases of his claim, which were that (1) his disability caused fatigue which resulted in a reduction of his work hours, (2) it became necessary for him to hire additional employees to perform work he could previously do, and (3) he sustained a net reduction in his profits as a result. Fish also maintains that Unum's vocational consultant used an improper job description and never provided an opinion concerning whether Fish could actually perform his job, given his impairments. Fish further argues that Unum ignored Fish's method of calculating his income loss, and that he sustained a 30.56% income reduction if the monthly figures are considered in the aggregate.

Fish contends that if *de novo* review does not apply, the heightened arbitrary and capricious standard governs due to Unum's conflict of interest inherent in its dual role of both administering and paying claims.  Fish contends Unum cannot "shed the taint of its self-interest" for several reasons, including:  (1) the claims file contains nothing suggesting that Unum's employees were doing anything to benefit the class of plan participants when they denied Fish benefits; (2) there is nothing in the claims file indicating that denying Fish's claim resulted in lower, or even static, premiums; (3) the two Unum physicians were themselves operating under a conflict of interest because their compensation "was in part tied to the profitability of the company," Doc. 31 at 17; (4) the in-house physicians, and Unum's decision-makers, failed to address Fish's decrease in hours; and (5) Unum's

appeals specialist "literally ignored" Fish's appeal letter "and the reasons he stated for the appeal in that letter," *id.* at 18.

In reply, Unum maintains that the benefit plan in question expressly granted Unum discretionary authority to determine eligibility for benefits and to construe the terms of the plan, that such delegations may properly be granted directly by a benefit plan, and that "delegation of discretion originated with Chick-fil-A, Inc., when it applied for and accepted the policy[.]" Doc. 39 at 2.  Unum then discusses the merits and reiterates that its benefit denial decision was "not *de novo* wrong."  *Id.* at 5-9.  Unum also contends that Fish did not show that his claimed loss of income was not attributable to circumstances other than his alleged disability, e.g., market factors.  Countering Fish's assertion that his profits were reduced because he had to hire additional personnel to perform tasks he could no longer do, Unum points out that Fish's wage expenses actually dropped during the period 1999 to 2001.

Finally, Unum addresses the conflict of interest issue by presenting an affidavit of one of its portfolio managers, stating that renewal rates for the Chick-fil-A plan are based on an Experience Rating, which consists in part of "past three-year claims experience (i.e., claims paid over the previous three years, including policy reserves on open claims being paid)."  Exhibit 1 to Doc. 39, ¶ 6, at 2. Continuing, the portfolio manager states:

> 7.  Under an Experience Rating system of rate renewal, the cost of a plan can either be adjusted downward when paid claims falls [sic] below actuarial expectations, adjusted upward when paid claims exceeds [sic] actuarial expectations, or remain static when paid claims coincide with actuarial expectations.
>
> 8.  When a class of participants, such as Class 001 Chick-fil-A Unit Operators, contributes to the cost of their LTD insurance, the entire class will benefit from a downward premium rate adjustment based on

> a positive claims experience relative to expectations.  Conversely, the
> entire class will be adversely affected from an upward rate adjustment
> based on a negative claims experience relative to expectations.

*Id.,* ¶¶ 7 & 8, at 2.  Relying on this evidence, Unum argues that "the 'taint' of self-interest is demonstrably purged."  Doc. 39 at 10.

In his cross- motion for summary judgment, Fish expands on prior positions and presents rebuttal arguments.  Addressing Unum's wage expense decrease argument, Fish points out that Unum did not base its claim denial decision on that ground.  Fish also points out that his store profits decreased following his injury; he attributes this to the fact that he was unable to be "on-site" as much after the accident.  Fish further maintains that Unum "has offered no explanation to disprove [Fish's] explanation that his store profits and, in turn, his operator income decreased because of his inability to participate in business operations."  Doc. 40 at 7.[16]

## VI.  ANALYSIS

### A.  Appropriate Standard of Review

The Court concurs with Unum that the arbitrary and capricious review standard applies.  As previously noted, the "Certificate Section" of the policy states: "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."  CC.FP-1.  This language is sufficient to trigger the discretionary review standard.  Additionally, there is even stronger discretionary language in a subsequent version of the policy which took effect on August 1, 2001:

---

[16]The time-period for Unum to respond to Fish's cross-motion has not yet run.  However, the Court determines that no response is necessary; the issues have been sufficiently aired on the present record.

**DISCRETIONARY ACTS**

> In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan.  Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in it discretion that the applicant is entitled to them.

UACL00260 (emphasis in original).  This discretionary language applies because it appears in the plan that was in effect when Unum denied Fish's claim.  *See Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan*, 298 F.3d 191, 196-97 (3rd Cir. 2002) (holding that plan in effect at the time of claim determination governs grant of discretion); *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 773-74 (7th Cir. 2003) (same).[17]

Further, the Court rejects Fish's "no delegation" argument.  It is clear that discretionary authority may flow directly from a benefit plan.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (holding that ERISA benefit denials are subject to *de novo* review "unless *the benefit plan* gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan" (emphasis added)).  The policy at issue did just that.[18]

However, Fish is correct in asserting that if the Court determines this case is subject to discretionary review, then the heightened version of the arbitrary and capricious standard applies.

---

[17]Unum has not raised the argument that the stronger discretionary language in the 2001 policy applies.  Nevertheless, that language cannot be ignored; it would be error to do so.  In any event, the grant of discretion contained in the earlier policy is alone sufficient to trigger arbitrary and capricious review.  The language in the 2001 policy merely buttresses the conclusion that Unum's decision is subject to deferential review.

[18]If the Court is wrong about the delegation issue, Unum would still be entitled to summary judgment under *de novo* review.

This is so because, indisputably, Unum operated under a conflict of interest by virtue of its dual administration/payment roles.

## B. Application

Regardless of the applicable standard of review, the first step is *de novo* consideration of the benefit denial decision. *See Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004) (the initial step is to "[a]pply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision" (footnote omitted)). Considering Unum's decision from that perspective, the Court determines that the insurer's decision was not wrong. The bottom line is that the medical and vocational evidence simply does not support the proposition that Fish was limited from performing the material and substantial duties of his occupation for a period of 180 days.

To summarize the medical evidence, Fish was injured on April 1, 2000. During much of his initial treatment, his orthopaedists did not believe he had sufficient disc protrusion to warrant surgery; at first, they focused primarily on his wrist. On May 23, 2000, less than two months after the accident (and perhaps earlier)[19], Fish was on "light duty restrictions" with instructions "No lifting or bending over 10 pounds until recheck." UACL00146. By his very next visit, on June 5, 2000, Fish reported that he was "working," and that he was "not doing any heavy lifting or bending." UACL00149. Three weeks later, on June 26, 2000, Fish was working full-time, subject to "common[-]sense restrictions," including "the recommendations of avoiding any heavy lifting or bending which he feels would

---

[19]As previously noted, the May 23, 2000 treatment notes state "[c]ontinue light duty restrictions," UACL00146, suggesting that Fish was subject to light duty restrictions before that date.

aggravate his symptoms." UACL00151.  On August 2, 2000, Fish was continued on "commonsense restrictions." UACL00156.  He stated he was "going to try to work, although there [were] times when he ha[d] a lot of discomfort and work [was] difficult." *Id.*  Two weeks later, on August 16, 2000, Dr. Broom was still hopeful that Fish could "improve without surgery." UACL00157.  On October 18, 2000, Dr. Gerber examined Fish and reported that Fish did not display any acute weakness, and that although he had "some pain with range of motion," he showed "no significant functional limitations in range of motion." UACL00158.  Fish was continued on the "same recommendations as previously," and reported that he was "working on a part-time basis." *Id.*

Fish underwent neck surgery on December 5, 2000.  A little over two weeks later, Fish's arm symptoms had resolved. UACL00163.  Dr. Broom stated he would "allow [Fish] out of work, but . . . would anticipate allowing him back to work with limitations on the next exam." *Id.*  True to his prediction, by Fish's next visit on January 12, 2001, Dr. Broom stated Fish could return to work, provided he avoid "excessive overhead work, frequent bending, twisting, climbing, and lifting over 10 lbs." UACL00164.  Fish remained subject to those same restrictions until his next visit, on March 16, 2001.  The day before that visit, Fish was able to play golf. UACL00166.  He had reached MMI and was told to "follow up as needed." *Id.*

In his April 2, 2001 letter to the attorney, Dr. Broom stated Fish might "occasionally require over the counter medication to control his discomforts" and that Dr. Broom had recommended a home exercise program, but that the physician "would not [otherwise] anticipate ongoing medical needs." UACL00026. Dr. Broom added that he had "not restricted [Fish's] activities," although he did not think Fish "should be expected to perform strenuous heavy lifting." *Id.*

In the last two orthopaedic visits documented in the claims file (October 15, 2001 and March 19, 2002), Fish's orthopaedists reported that he could work without restrictions.  UACL00167 & 168.

The medical records thus show that Fish was placed on light duty restrictions (including not lifting more than 10 pounds) for less than three months following his injury.  He was never told he should not work.  In fact, within a relatively short time following the accident, he was back to work. Less than three months after he was injured, Fish was working full-time.  By then, Fish was subject to "common[-]sense" restrictions; rather than being instructed not to lift more than 10 pounds, Fish was told to avoid "heavy lifting."  Four months after the accident, Fish was still trying to work, although he sometimes found work to be difficult.  By mid-October 2000, Fish had dropped back to part-time work status.  Fish's work status from that time until his December 5, 2000 surgery is unclear.    Five weeks after he underwent surgery, Fish was released to work subject to the restrictions of no excessive overhead work, frequent bending, twisting, climbing, and lifting over 10 lbs. A little more than two months later, Fish had reached maximum medical improvement; indeed, he had recuperated to the point that he was able to play golf.  Four months after the surgery, Dr. Broom stated that Fish's activities were unrestricted, although he should not perform "strenuous heavy lifting."  Thereafter, Fish's orthopaedists reported that he could work without restrictions.  This medical evidence belies Fish's claim that he was "knocked . . . out of the unit for the better part of a year plus, well past the date of [his] surgery." UACL00215.  To the contrary, it appears Fish was not restricted from performing the essential functions of his job during much of this period.

Fish's self-prepared "disability summary" is also insufficient to support a finding of disability under the policy definition.  According to Fish, he was totally unable to work "on several days during the first few weeks after 4-01-00." UACL00043.  Fish reported that "[o]n other days during the first

few weeks after 04-01-00, [his] injuries rendered [him] partially unable to work." *Id.* These particular statements square with the medical evidence. However, regarding the remainder of the time period leading up to his surgery, the best Fish could say was that his "ability to do his work was limited by [his] injuries." *Id.* He stated he could not otherwise define the extent of his disability during that period, except that his medical records would show when he missed work for the purpose of receiving medical care. *Id.* Such vague statements are insufficient to establish that Fish was unable to perform the material and substantial duties of his job for any particular time period. The medical records are far more detailed; they reflect that Fish was working full time, and was subject only to common-sense restrictions (including no heavy lifting or bending), during some of the time period between his injury and his surgery.

With regard to the period following his surgery, Fish reported in his disability summary that he was "totally disabled from work" from December 5, 2000 through February 12, 2001. *Id.* However, the medical records reflect that Fish was actually released to return to work, subject to restrictions, one month prior to that date. UACL00164. Fish also claimed that since February 12, 2001, his ability to work "has continued to be limited," but that he could not "otherwise specify the extent of [his] disability" since that date. *Id.* Again, this information is woefully vague. The medical records clearly evidence that by April 2, 2001 (and probably earlier), Fish's orthopaedists had lifted all restrictions except "strenuous heavy lifting." UACL00026.

On that point, Fish has not presented any evidence that heavy lifting was one of his material and substantial job duties. Fish's own description of his job duties did not list heavy lifting as one of his work activities. UACL00038. In fact, Fish admitted in his appeal letter that "a Unit Operator may not have to lift 35 to 50 lbs.[.]" UACL00217. The Court agrees with Unum's vocational

rehabilitation specialist that Fish's position as a restaurant owner/operator was generally consistent with the job description of fast food services manager. Although there may be additional duties that an owner might be required to perform, such activities would likely be primarily non-exertional in nature. Hence, the Court concurs that Fish's job required only light exertion. For much of the interval between his injury and his surgery, Fish could engage in light exertional activities. Following his recuperation from neck surgery, Fish unquestionably could (and can) perform tasks requiring light exertion. Indeed, the record demonstrates that Fish recovered to the point that he can undertake activities requiring greater strength than light exertion.

Additionally, the Court rejects Fish's criticism that the DOT job description is unduly stale. In that regard, Fish comments: "[T]he D.O.T. states that its listing for 'Manager, Fast Food Services' was last updated in **1981**! This is before the advent of nearly every modern computer system." Doc. 31 at 12 (emphasis in original). But this observation actually cuts against Fish. The advent of more modern computer systems and other technological advances since 1981 would presumably lessen the burden of a restaurant owner, not increase it.

Fish also maintains that he could not (and cannot) work as many hours following his injury because he tires more easily. This claim, too, is short on specifics. Fish has not presented any evidence whatsoever to substantiate his claim of reduced work hours, except as to a short period following his initial injury, for some unspecified time when he cut back to "part time," and during his relatively brief recuperation from surgery. As Unum notes, there is no specific mention in the medical records of increased fatigue. After his accident, Fish was limited to "light duty" for a relatively short period of time, but there is no indication that his orthopaedists ever told him to reduce his hours, on grounds of fatigue or otherwise. Moreover, the medical records cannot be construed as objectively

-32-

supporting any claim of increased fatigue after Fish recovered from his surgery.  To the contrary; those documents clearly demonstrate that Fish's surgery was successful, and that he recovered well, albeit with an 8% whole body permanent impairment rating and subject to the recommendation that he not engage in strenuous heavy lifting.

From the perspective of *de novo* review, the evidence does not show that Fish was unable to perform the substantial and material duties of his job for a period of time sufficient to satisfy the elimination period in his disability policy.[20]  Accordingly, Unum is entitled to summary judgment at the first step of the deferential review analysis.[21]

Even if the Court were to conclude that Unum's decision was "wrong" from the perspective of *de novo* review, the insurer's decision was nevertheless reasonable.  Extended discussion of this point is unnecessary.  It suffices to say that the evidence that supports the Court's finding that Fish was not disabled mandates the conclusion that Unum's decision was reasonable.

However, the Court would be required to evaluate Unum's conflict of interest and apply the heightened version of the arbitrary and capricious standard of review.  The Court determines that the unrebutted affidavit of Unum's portfolio manager - indicating that payment of non-meritorious claims can raise unit operators' premiums under the policy - is sufficient to overcome the conflict of interest inherent in Unum's dual administration/payment role.

---

[20]This conclusion means that Fish loses even if *de novo* review applies, rather than the arbitrary and capricious standard.  Considering all of the evidence anew, no reasonable fact-finder could conclude that Fish met the policy's definition of disability.

[21]Given this conclusion, the Court need not decide the question of whether Unum properly calculated Fish's monthly income for the purpose of determining whether Fish met the policy's income loss threshold.

## VII. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1.  Defendant Unum Life Insurance Company of America, Inc.'s Dispositive Motion for Final Judgment, or, in the Alternative, for Final Summary Judgment (Doc. 26), filed August 11, 2005, is GRANTED.

2.  Plaintiff Charles Fish's Dispositive Motion for Summary Judgment (Doc. 40), filed November 18, 2005, is DENIED.

3.  The Clerk shall enter a final judgment providing that the Plaintiff, Charles Fish, shall take nothing on his claims against the Defendant, Unum Life Insurance Company of America, Inc.  The judgment shall further provide that Unum shall recover its costs of action from Fish.

4.  Any other pending motions are moot.

5.  This case is removed from the May 2006 trial calendar.

6.  The Clerk shall close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on November 29, 2005.


ANNE C. CONWAY
United States District Judge


Copies furnished to:

Counsel of Record

-34-

Unrepresented Party